THE STATE *Ex Rel.* B. D. TOWNSEND, PRESIDENT CHERAW AND SALISBURY R. R. COMPANY, WILLIAM T. WALTERS AND BEN-JAMIN F. NEWCOMER *vs.* HENRY McIVER, PRESIDENT, AND JOHN H. McIVER, SECRETARY AND TREASURER CHERAW AND DARLINGTON R. R. COMPANY.

The Supreme Court has power, under Sec. 4, Art. IV, of the Constitution, to issue writs of *mandamus* upon original applic tions having no conn ction with any suit or action in an inferior Court, or with any writ of error or appeal pending before the supreme Court.

A rai road company, chartered by the State, is so far a public corporation that its officers owe duties to the public, which they may be compelled to perform, by writ of *mandamus,* and among them are their duties relative to the capital stock of the company and their control of the transfer thereof.

Parties seeking a transfer of the stock of a corporation must comply with the rules of the corporation, relative to such transfers, but where that is done, the officers of the company have no right to withhold their assent, because, in their judgment, the motives and purposes of the parties are improper, or because the transfer may affect, injuriously, the interests of the company itself, or those of some other company.

In the absence of any by-law, or other law, of a corporation, regulating the mode in which its s ock shall be transferred, transfers must be made in the manner prescribed by the usages of the company, or set forth in the certifi-cates of its stock.

A mere notice to the officers of the company, from parties having a beneficial int rest in the stock sought to be transferred, that the right of the party having the legal title to make the transfer is questioned and will be con-tested, will not justify the officers in a persistent refusal to make the trans-fer, after a reasonable and sufficient time has elapsed to enable the parties giving the notice to institute legal proceedings to contest the right to make the transfer.

The acts of one holding the office of President of an incorporated company, and claiming to have been duly elected, will be valid and binding on the comi any until he is ousted, by proceedings instituted for that purpose—*semble.*

*Mandamus* to compel a transfer of stock will not be granted where there has been no demand and refusal to make the transfer; but where the rules of the company required that the certificate of stock should be transferred "in person or by attorney at the office" of the company, and it appeared that a demand had been made by letter and that the officers of the company had peremptorily refused to permit the transfer to be made : *Held,* That it was not necessary to show that the useless ceremony of appearing at the office and there demanding the transfer, had been observed.

Townsend *vs.* McIver.

Where the stock sought to be transferred is owned by a corporation whose Directors, being vested with the necessary power to that end, authorize its President to sell it, a contract of sale by h·m shows a sufficient legal and equitable title in the purchaser to entitle him to the writ of *mandamus* to compel the officers to transfer the stock to him,

It is no ground of objection to the issuing of a writ of *mandamus* to compel the transfer of stock, that the purchasers have joined with the sellers in the application for the writ.

Though it be true that *mandamus* will not lie, unless the duty to be performed is one in which the public have an interest, and not even then, where the party demanding the writ has another plain and adequate remedy, yet the duty of the officers of a railroad corporation to permit the transfer of its stock, is one in which the public has a sufficient interest to warrant the Court in issuing the writ of *mandamus* to compel its performance, and the remedy by action against the officers of the corporation to recover damages for their refusal to permit the transfer is too doubtful and uncertain in its character to supersede the specific and speedier remedy by *mandamus*.

This was an original application to this Court to compel the respondents to permit certain shares in the capital stock of their company to be transferred, and to issue new certificates to the purchasers. As the case is one of novel impression in this State, it is deemed expedient to report the proceedings almost in full, so as to enable the reader to see clearly the practice adopted, as also to understand, fully, the points of law made and decided. The petition, after giving the names of the State and the Court, and the address " to the Chief Justice and the Associate Justices of the Supreme Court of the State of South Carolina," proceeded as follows:

The humble petition of Benjamin D. Townsend, a citizen of the State of South Carolina, and resident of Darlington County, in the said State, and, also, of William T. Walters and Benjamin F. Newcomer, of the State of Maryland, respectfully sheweth unto your Honors that, on the      day of May, A. D. 1866, at a meeting of the stockholders of the Cheraw and Coalfields Railroad Company, held in the city of Charleston, S. C., B. D. Townsend was unanimously chosen President of the said company, which had been duly chartered by the Legislatures of the States of North and South Carolina, and continued in the discharge of the duties of said office until the next annual meeting of the said stockholders, in the month of May, A. D. 1867, held at the same place, when he was again elected unanimously to the same office. At the regular annual meeting in 1868, a majority of the stock of said company not being represented, and there, hence, being no quorum, there was no election for officers, consequently your petitioner, B. D. Townsend, and his Board of Directors, in default of an election, held over and continued in the discharge of their duties until the next

regular annual meeting of the said stockholders, held on the 12th day of May, A. D. 1869, in the town of Cheraw, S. C. By effort and zeal, on the part of some of the stockholders, a full attendance upon this meeting was secured, and there was almost if not an entirely full representation of the stock of said company, either in person or by proxy. The meeting was a large and enthusiastic one, and your petitioner, B. D. Townsend, was again almost unanimously elected President, and the following persons Directors, viz: A. F. Ravenel, L. D. Mowry, A. J. White, S. J. Townsend, W. H. Robbins, L. Green, D. Ingraham, R. J. Donaldson and D. Malloy. At this meeting the stockholders adopted sundry resolutions, and among them one authorizing and empowering your petitioner, B. D. Townsend, and the Board of Directors elect, to use all the funds and assets of the said company, as they, the said President and Directors, might deem best for the interest of the said road, the name of which was then changed from that of the Cheraw and Coalfields Railroad to the Cheraw and Salisbury Railroad, the northern terminus changed from Coalfields, in the State of North Carolina, to Salisbury, in the said State, and all the provisions of the last Acts of the Legislature of the said States amendatory of previous ones were then and there fully accepted by the said meeting. Since that time, your petitioner, B. D. Townsend, as President, has worked and labored as zealously in the discharge of his duty, and in the interest of the said company, as his ability would enable him to do, enjoying the co-operation of the Directors aforesaid, but has experienced great embarrassment in forwarding this enterprise of public importance, from want of funds sufficient to carry on the work. The company was the owner of four thousand and thirteen shares of the stock of the Cheraw and Darlington Railroad, which your petitioner, B. D. Townsend, regarded as proper to be sold, as otherwise it could prove of poor service to the company. Accordingly, at an adjourned meeting of the said Board of Directors, held on the 11th day of August last, (1869,) B. D. Townsend submitted a report in full concerning the affairs of the said road, its present condition and future prospects, and, among other things, recommended the sale of said stock, and gave his reason for so doing. All the Directors were present except three. The report was fully considered, and adopted by the unanimous voice of those present, who also passed a resolution authorizing, empowering and instructing your petitioner, B. D. Townsend, as their President, to sell the said stock

as soon as he could secure therefor ten dollars per share, less broker-age, or twenty per cent. of its par value. Your petitioner, B. D. Townsend, under this resolution of the said Board, and the afore-said resolution of the stockholders, on May 12th, 1869, deeming his authority to make the sale unquestionable, and knowing the Cheraw and Darlington Railroad to be greatly embarrassed, and deeming the aforesaid price exceedingly fortunate to his com-pany, if the same could be secured, succeeded in effecting the said sale of this stock to your petitioners, Messrs. Walters & Newcomer, of Baltimore, with whom he had been previously negotiating, who paid your petitioner, B. D. Townsend, two thousand dollars in cash, and gave their written obligation to pay him the balance, about thirty-eight thousand dollars, so soon as the proper and lawful transfer thereof could be made upon the books of the Cheraw and Darlington Railroad Company, at their office in Cheraw. This sale occurred on the 13th day of August, and, to consummate the same, the purchasers thereof dispatched one Mr. R. R. Bridges, as their agent, to proceed in company with your petitioner, B. D. Townsend, to the office of the Cheraw and Darlington Railroad Company, in Cheraw, S. C., for the purpose of having the said certificates of stock properly transferred upon the books of the said company, as the rules and by-laws, and the certificates them-selves, required, a complete transfer requiring not only the receipt and transfer of your petitioner, B. D. Townsend, but the signa-tures of the President and Secretary of the said Cheraw and Dar-lington Railroad Company. The aforesaid R. R. Bridges, as agent of the said purchasers, Messrs. Walters and Newcomer, being pre-pared, upon the delivery of the certificates of stocks signed, as aforesaid, to pay your petitioner, B. D. Townsend, the balance of the said purchase money, as per terms of sale. But your petitioner, B. D. Townsend, and the said Bridges, having made a demand upon Henry McIver, Esq., President, and John McIver, Esq., Secretary and Treasurer of the said Cheraw and Darlington Railroad Com-pany, to make the proper entries in the books of said company, and permit your petitioner, B. D. Townsend, to enter the proper receipts and transfers, as their rules and by-laws and the terms of the said certificates require, in order to a lawful sale and transfer, to your petitioner's (B. D. Townsend's) great surprise, they positively re-fused to do and permit the same to be done, and still persist in so refusing, alleging, as an excuse therefor, that the attorney of cer-tain stockholders of the said Cheraw and Salisbury Railroad have

notified them that legal proceedings are about to be instituted to prevent the said transfer of stock from being consummated, and alleging sundry other frivolous and unfounded excuses and pretexts for their declining and refusing to do this plain act of duty. Your petitioners respectfully shew unto your Honors that this refusal of their just and reasonable demands is unjust, unlawful, directly and immediately damaging to the interest of themselves and the said company, and may work irreparable injury to them and the public, who are interested and concerned in the completion of the said road. The right and authority of your petitioner, B. D. Townsend, to make the sale cannot soundly be questioned; the title of the said purchasers is good in law—the immense advantage of the sale to the said company is too manifest to be gainsaid, and this conduct of the said officers in refusing to allow the transfer to be properly recorded, and to issue new certificates to the purchasers, may, and probably will, by its delay, cause and necessitate the recission of the sale or contract. Without this money, your petitioner, B. D. Townsend, cannot proceed with the work on the said road ; the engineers and other employees will not labor without pay, and there being no money in the Treasury, all such employees and subordinates will be compelled to quit and seek employment elsewhere. The public along the line, who are now much encouraged and becoming willing to subscribe, will again become lukewarm and discouraged, and will withhold the proffered and promised aid. The Legislatures of the two States will probably be loth to aid a company thus blocked in its progress; and, in fine, the labors and efforts of years be lost by a forfeiture of charter, and the State damaged by the loss of a splendid sale of bad stock. Your petitioners further shew that, if the parties thus offending were the representatives of a perfectly solvent corporation, they would still be without any adequate and complete remedy by ordinary suit for damages at law, specific performance in equity, or similar proceedings, because of the slow and tedious progress ordinarily of such suits, during the pending of which the work on the said road must, from necessity, be at a stand-still for want of funds, as it now is and has been.

But your petitioners further shew, that the said Cheraw and Darlington Railroad Company is, from the best of their knowledge and belief, totally insolvent, and could not respond in damages at all adequate to the loss inflicted, should your petitioners elect an action with a view of recovering damages. The said Henry Mc-

Iver, Esq., and John McIver, Esq., are, therefore, the representatives of a road, under heavy existing liens and incumbrances, unable to answer in damages, while the said Cheraw and Salisbury Railroad is, in its infancy, greatly and absolutely in need of this fund immediately, and in danger of forfeiting its charter, unless the work is soon begun, which cannot be conveniently done without this fund.

Therefore, your petitioners respectfully submit that this refusal is not only an injury to themselves, personally, and the stockholders of both of said roads, but it is an injury to the public, by checking the construction of an important highway, and violating and infringing the chartered rights and privileges conferred by the Legislature upon the stockholders of the said Cheraw and Salisbury Railroad Company, and Cheraw and Darlington Railroad Company, and entitles your petitioners to invoke the most speedy, adequate and complete remedy and relief within the power of this Honorable Court.

In view of these facts, the necessitous condition of the Cheraw and Salisbury Railroad Company, its present indebtedness, the insolvency of the Cheraw and Darlington Railroad Company, in consideration of the premises, and entire absence of any adequate remedy, at law or in equity, your petitioners humbly and respectfully pray your honors to grant unto them a rule issuing from this Honorable Court, directed to Henry McIver, Esq., President of the Cheraw and Darlington Railroad Company, and John McIver, Esq., Secretary and Treasurer, commanding them, and each of them, to show cause before your Honors, at a time and place therein to be specified, why a writ of *mandamus* should not issue, enjoining, directing and commanding them, and each of them, to sign the necessary certificates of stock upon the books of the said company, at their office in Cheraw, and to suffer and permit your petitioners to have access to the books, and to sign thereon all necessary receipts and transfers of stock to the said Messrs. Walters and Newcomer, of Baltimore, or their assigns, and commanding them to issue new certificates of stock to the said purchasers, and to do and perform all and every act necessary upon the books of said company to complete and perfect the sale of stock made by your petitioner, B. D. Townsend, to the purchasers aforesaid, according to the terms thereof.

And your petitioners, in confirmation and verification of the statements, allegations and charges upon which the prayer of the

petitioner is based, respectfully submit for reference, as exhibits to this petition and part thereof, the books of this said Cheraw and Coalfields, and Cheraw and Salisbury Railroad Company, containing the Journal or Minutes of the meetings of the stockholders and Directors thereof. Also, the Acts of the Legislatures of North and South Carolina, incorporating the said company, and those subsequently amending the same. The copy of the written contract of sale to Messrs. Walters and Newcomer. All of which they pray may be taken as part of the petition for all necessary reference. And upon this array of facts, your petitioners humbly pray the rule above craved. And they will ever pray, &c.

The petition was signed by the attorneys of the petitioners, and verified on the 13th April, 1870, by the oath of B. D. Townsend, one of the petitioners. It was filed in the Supreme Court on the 13th April, 1870, and was supported by an affidavit as follows :

THE STATE OF SOUTH CAROLINA, }
RICHLAND COUNTY.

Personally appeared before me, B. D. Townsend, of Darlington County, State aforesaid, who, being duly sworn, deposes and says: That he is, and has been, a Director of the Cheraw and Darlington Railroad Company for the last ten years, and as such has become familiar with the financial condition of that corporation; that, at one time, he was Chairman of the Finance Committee of the Board of Directors, and in that capacity enjoyed extraordinary opportunities for ascertaining the pecuniary standing of the Board ; that the Company owes, according to information he has derived from authentic sources, $150,000 of first mortgage bonds, which mature on or about the first of next April ; that there is a second mortgage bonded debt of $75,000, which was extended for twenty years, perhaps, some two years ago ; that there are some $40,000 or $50,000 of certificates of indebtedness having some five or six years to run, funded upon the past due coupons, which matured during and immediately after the war ; that some $10,000 to $15,000 of these past due coupons were held by parties who declined to fund them, and are still held, part of them in judgments and some of them without suit, up to this time ; that, in addition to these matured obligations, other debts are due for land damages, damages to persons and property, &c., &c.; that, in the well-founded opinion of

this deponent, all these debts of the Cheraw and Darlington Railroad Company, upon which current interest has to be paid, will probably amount to but little short of $300,000; that the current interest upon this debt absorbs about all the revenue derived from the operation of the road, leaving nothing for the stockholders, who hold nearly $400,000 of its stock; that for the funded and judgment creditors to press their claims under present circumstances would probably involve the Cheraw and Darlington Railroad Company in bankruptcy, and the stockholders' interest would become worthless; that this deponent is familiar with the road-bed, superstructure, equipment, and indeed the entire property owned by said corporation, and does not hesitate to express the opinion and belief that a suit to recover damages from the officers of said corporation, should they become liable on account of the obstacles they are throwing in the way of a sale of the four thousand and thirteen shares of the Cheraw and Darlington stock, sold to Messrs. Walters & Newcomer, would be inadequate, and probably amount to nothing, on account of the insolvency of the corporation, incumbered, as it is, with so many heavy obligations secured by liens, most of them in a position to be speedily enforced.

B. D. TOWNSEND.

Sworn to and subscribed before me, this 14th day of April, A. D. 1870.

D. H. CHAMBERLAIN,<br>Notary Public.

A rule properly entitled, dated 13th April, 1870, and signed by the Chief Justice, was issued, as follows:

"Whereas, it has been suggested by the petition of B. D. Townsend, as President of the Cheraw and Salisbury Railroad Company, William T. Walters and Benjamin F. Newcomer, of Baltimore, and the affidavits accompanying: That the said Benjamin D. Townsend, as President of the Cheraw and Salisbury Railroad Company, under and by virtue of authority conferred upon him by the Board of Directors of the said company, at their meeting of August 11th, A. D. 1869, did, upon the 16th day of August, 1869, sell to Messrs. Walters and Newcomer, of Baltimore, Maryland, according to negotiation closed by telegram on the 13th day of said month, four thousand and thirteen shares of the capital stock of the said Cheraw and Darlington Railroad Company, held and owned by the said

Cheraw and Salisbury Railroad Company, for the sum of forty thousand dollars, less commissions and brokerage, two thousand dollars of the same being paid in cash, and the balance to be paid to the said Townsend, as President as aforesaid, as soon as the transfer thereof could be made upon the books of the Cheraw and Darlington Railroad Company, at their office in Cheraw;

" And whereas, it is further suggested that the said Townsend, as President as aforesaid, and one R. R. Bridges, as Agent of the said purchasers, did soon thereafter demand of Henry McIver, Esq., President, and John H. McIver, Esq., Secretary, of the said Cheraw and Darlington Railroad Company, in Cheraw, to permit the necessary transfers of the said shares to the said Walters and Newcomer to be made upon the books of the said company, in Cheraw, S. C., and to issue new certificates of stock in lieu thereof to the said purchasers; and that the said officers did then, and do now, refuse to permit the said transfer to be made, and to issue the said new certificates, and do refuse to do or permit to be done any and all acts upon their books requisite, under their by-laws, rules and regulations, to complete the transfer of the said stock;

" And whereas, it is suggested that the said Townsend, as President of the said Cheraw and Salisbury Railroad Company, and the said company, the said Walters and Newcomer, are damaged by such refusal, and are without specific and adequate remedy at law in the premises;

" It is, therefore, *ordered*: That the said Henry McIver, Esq., President, and John H. McIver, Esq., Secretary, of the said Cheraw and Darlington Railroad Company, do, on the 14th day of April, A. D. 1870, at 10 o'clock A. M., show cause, before the Supreme Court, why a writ of *mandamus* should not issue forthwith from the said Court, commanding, enjoining and compelling them, and each of them, to permit the transfers of the said four thousand and thirteen shares of the capital stock of the said Cheraw and Darlington Railroad Company, at their office in Cheraw, to the said Messrs. Walters and Newcomer, the purchasers, and to issue them new certificates in lieu thereof, and further to do, and permit to be done, any and all acts upon said books in said office necessary to a complete transfer of said capital stock, in compliance with the by-laws, rules, regulations and charter of the said Cheraw and Darlington Railroad Company."

3A

A second rule, dated April 14th, 1870, was issued, as follows:

" A rule in the above entitled cause having issued from this Court, returnable on the 14th instant, at 10 o'clock A. M., and it now appearing that the defendants have not been personally served with notice of said rule, it is now ordered, on motion of Messrs. Harllee and Chamberlain, attorneys for the relators, that the rule to show cause in the above entitled matter be made returnable on Thursday, the 21st instant, at 10 o'clock A. M., and that service be made upon the defendants by copy of the rule, with the petition and accompanying affidavits."

The petition, affidavits and rules were served on the defendants, personally, by delivering to each. of them copies thereof. The service was made by the Sheriff of Chesterfield County, on the 15th April, 1870, and his certificate of service was verified by his oath.

The defendants made a return to the rule, which, after the usual caption and address to the Court, proceeded as follows:

Henry McIver, President, and John H. McIver, Secretary, of the Cheraw and Darlington Railroad Company, upon whom has been served a rule, issued by this honorable Court, ordering them to shew cause before it why a writ of *mandamus* should not issue forthwith from the said Court, commanding, enjoining and compelling them, and each of them, to permit the transfer of certain shares of the capital stock in the Cheraw and Darlington Railroad Company, at their office in Cheraw, to Messrs. Walters & Newcomer, alleged to be purchasers, and to issue to them new certificates in lieu thereof, and further to do, and permit to be done, any and all acts upon said books in said office, necessary to a complete transfer of said capital stock, in compliance with the by-laws, rules, regulations and charter of the said Cheraw and Darlington Railroad Company, for return and answer to said rule, and for cause why a writ of *mandamus* should not issue, as suggested, do say:

That they are advised that the writ of *mandamus*, when sued out by a private individual, is "assimilated, both in its direct and incidental proceedings, to an action," and, considered as a civil suit, properly falls within the " civil jurisdiction," which, by the first Section of Article Fourth of the Constitution, is vested in the Circuit Court of Common Pleas, and is expressly vested in said Court by the fifteenth Section of said Article.

That the Supreme Court of the State is clothed by the Constitution with appellate jurisdiction, and constitutes a Court for the correction of errors at law, occurring in the judgment of the Circuit and Inferior Courts, and has no jurisdiction in *mandamus* except as such Appellate Court.

That, as such Supreme Court, it is empowered to issue *mandamus*, and other remedial writs, in such cases only " as may be necessary to give it a general supervisory control over all other Courts in the State."

That, to allow private suitors in *mandamus* to institute an action in this Court, would be to extend to them a special privilege not accorded to suitors in civil actions generally in the State, lowers the dignity of this, as a Supreme Court, to the level of the inferior Courts, in the exercise of jurisdiction, and destroys its character as a Court of review and final resort.

That the Constitution contemplates a uniform system in the course of proceedings for enforcement of civil remedies, and the right to the modes of defence and to the usual and appropriate rules and forms of pleading · and practice, existing in Courts of Common Pleas, is one of which the respondents should not be deprived.

That the machinery and rules of the Supreme Court are not adapted to the conduct of a suit between individuals involving common law pleadings and issues of fact.

These respondents, further answering, say: That they are merely the officers and agents of a private corporation; and, as to the shares of the capital stock in said company, they owe no public duty whatever, properly the subject of *mandamus*.

That these respondents have, as agents of the company, a duty and responsibility to the said company, in preserving the proper registry of the titles of the legal owners of the stock, and likewise to said owners, but not to the public; and there exists no by-laws of the company whatever, nor are there any specific rules or regulations on the subject.

That no clause of the charter of said company, nor any statute law of the State, prescribes a specific duty in the transfer of title to the shares of stock to said corporation, nor to its officers, nor either of them, enforceable by *mandamus*.

That, by the nature of the said joint stock company, the Cheraw and Darlington Railroad Company is, as to the shares of said stock, and, as to the registry and certificates thereof, a trustee for the

owners of said shares, accountable therefor in equity, and bound to recognize and protect the registered owners thereof, respectively, as the only true and lawful owners, until satisfactory proof has been furnished, in every case, to the above named officers, that the complete legal and equitable title to said stock has been properly transferred, by one duly authorized to make such transfer, and until the certificate of ownership, duly assigned, shall have been produced at the office of the Secretary of the company, or its loss regularly accounted for ; and that, for any breach of its said trust, the company is answerable in equity.

That by the terms and conditions contained in the certificates, and the endorsements thereon, and by the issuing of said certificates, the said Cheraw and Darlington Railroad Company enters, in every case, into a contract with the holder of said certificate, and owner of the share or shares of stock, whereby it undertakes and assumes that its officer or officers shall not and will not suffer or permit a transfer of the title to such share or shares of its stock to be entered upon the books of the company, except to one who has obtained the complete legal and equitable title, and who shall produce, at the office of the Secretary of the company, in evidence thereof, the certificate of stock, properly assigned, by one duly authorized to transfer the property. That for any violation of the terms of such contract, the said Cheraw and Darlington Railroad Company, and its officers above named, are liable, in actions at law, for·damages.

And these respondents shew that, as to the four thousand and thirteen shares in the capital stock of the said Cheraw and Darlington Railroad Company—referred to in the petition of Benjamin D. Townsend, and in the rule issued thereon—the owner thereof is the Cheraw and Coalfields Railroad Company, as appears by the registry on the books of the corporation of which these respondents are the officers ; and that the said Cheraw and Darlington Railroad Company are trustees of said stock for the said Cheraw and Coalfields Railroad Company, or its lawful assigns, accountable to it for the care thereof, responsible to it and them for the lawful transfer of said shares, according to the terms of its contract, and liable in damages for the transfer of said shares, according to the terms of its contract, by order of any party not legally authorized to order such transfer, or to any party who has not acquired, in good faith, the legal and equitable title thereto.

And these respondents shew, that only the party having the legal

and equitable title complete in himself, and producing at the office of the company the certificates of stock properly assigned, by one duly authorized, can legally demand the transfer of the stock. That, as to the four thousand and thirteen shares above mentioned, no such demand has ever been made, nor have the certificates of stock, properly assigned, ever been produced at the office of the company, by Walters and Newcomer, or any purchaser holding the legal and equitable title to said stock, nor has any refusal been made to such lawful demand.

These respondents deny that Benjamin D. Townsend and R. R. Bridges, as alleged in the petition, did ever make demand, as required by law, and deny that these respondents have made refusal to their lawful demand.

These respondents admit that a letter was received from the said Benjamin D. Townsend, as President of the Cheraw and Salisbury Railroad Company, the contents of which are as follows :

OFFICE OF CHERAW AND SALISBURY R. R. Co., }
SOCIETY HILL, S. C., August 30, 1869. }

To Messrs. HENRY McIVER, President, and JOHN H. McIVER, Secretary and Treasurer of the Cheraw and Darlington Railroad Company :

GENTLEMEN : In a personal interview I informed you both, upwards of a week ago, that in obedience to instructions from the Board of Directors of the Cheraw and Salisbury Railroad Company, I had sold to Messrs. Walters & Newcomer, of Baltimore, the four thousand and thirteen shares (4,013) owned and held by the said Cheraw and Salisbury Railroad Company, in the capital stock of the Cheraw and Darlington Railroad Company. By the terms of this sale, as you both saw, in papers exhibited to you, two thousand dollars were paid in cash, and the residue, amounting to upwards of thirty-eight thousand dollars, is to be paid as soon as the proper transfer is made on the books of the Cheraw and Darlington Railroad Company, according to the terms of the certificates. The object of this communication is to formally demand, what I understood you both to decline, that the proper transfer be made immediately to the bona fide purchasers, Messrs. Walters & Newcomer, of Baltimore, Maryland, and to notify you that, in the event of your refusal to perform this official act, which is only necessary to complete the transaction, I, in the name of the corporation I represent in the matter, will hold you, jointly and individually, both

privately and officially responsible for all losses, injury and damages that may result from such refusal, to either myself, the Cheraw and Salisbury Railroad Company, or the purchasers, Messrs. Walters & Newcomer. An early and explicit reply to this demand, in writing, will oblige

Your obedient servant,

B. D. TOWNSEND,
President Cheraw and Salisbury R. R. Co.

These respondents refused to accede to the demand contained in the above letter for many cogent reasons, which governed them in the exercise of their official discretion, and in the discharge of the responsibility which attached to them as agents of the Cheraw and Darlington Railroad Company, and to their company as trustees of the said shares of stock belonging to the Cheraw and Salisbury Railroad Company. The demand was irregular, informal and illegal. The letter of Mr. Townsend declared that he had sold the stock, and that Walters & Newcomer, of. Baltimore, Maryland, were the purchasers. If this were true, then the sole right to demand the transfer was in said purchasers, who, as all other transferees in like case, were bound to produce the certificates of stock, duly assigned, at the office of the company; and, moreover, if required, to satisfy the officers of the entire legal and equitable title being complete in the purchaser, of the authority of the person ordering the transfer, and of any other matter or thing affecting the transfer of title. Without the production of such certificates and proof, these respondents had and have no right or power to make any transfer. The demand was not even made in the name of the pretended purchasers, Walters & Newcomer, nor by any warrant from them, but in the name of "B. D. Townsend, President of the Cheraw and Salisbury Railroad Company."

The letter further contained the distinct notice that the stock had not been paid for; that the agreement for sale was executory; the sale, if sale at all, merely incheate, and the legal title still in the Cheraw and Salisbury Railroad Company, and not in the proposed transferees.

In the face of such notice, these respondents could not consent to transfer the title of the Cheraw and Salisbury Railroad Company.

These respondents further shew that, before the receipt of the letter of the said B. D. Townsend, these respondents had received

Columbia, April, 1870.

notice from stockholders of the Cheraw and Salisbury Railroad Company not to transfer said shares; that the attempt to sell the said stock would be resisted; that the title of said Benjamin D. Townsend, as President, and that of the Directors of the Cheraw and Salisbury Railroad Company was disputed, and the authority of the relator to carry on the attempted sale, and to order the transfer of the stock was denied; that legal proceedings would be instituted to test the questions. These respondents are informed that such proceedings were soon thereafter instituted, are now pending before the Courts, and that Messrs. Walters and Newcomer have long since had notice thereof. These respondents are also informed that the authority claimed by the said Benjamin D. Townsend, under resolution of said Board of Directors, directs and empowers him to sell said shares for a stated price, to receive the purchase money, and thereupon to make the transfer; but that neither under said resolutions, nor by virtue of his office as President, has said Benjamin D. Townsend, under an executory agreement, any authority to deliver said certificates, or to order the transfer of said shares. These respondents, in good faith, as officers of the Cheraw and Darlington Railroad Company, declined to accede to Mr. Townsend's demand, not feeling themselves called on to assume the grave responsibility to themselves and to the corporation, of deciding the questions raised as to said sale, and as to the title and authority of the said Benjamin D. Townsend and his Board of Directors, and regarding themselves as wholly without authority, by making the transfer, to determine the matter in dispute between Mr. Townsend and his constituents, who are the real owners of the stock. And these respondents deny that the said Townsend, as President of the said Cheraw and Salisbury Railroad Company, are damaged by such refusal, but, on the contrary, these respondents are informed, and believe, that the object of the attempted sale is to give to the said Walters and Newcomer, and the said R. R. Bridges, a controlling interest in and over the affairs of the said Cheraw and Darlington Railroad Company, thereby seriously damaging the interest of the said Cheraw and Salisbury Railroad, and its allied roads, incorporated by the State of South Carolina, and built by the State as a continuous line for the benefit of the citizens of the State. That the said R. R. Bridgers and the said Walters and Newcomer are deeply interested in the Wilmington and Weldon Railroad Company, and the Wilmington and Manchester Railroad, and that they desire to purchase

said stock, and to control the said Cheraw and Darlington Railroad and Cheraw and Salisbury Railroad, for the purposes of their own rival line by way of Wilmington, for their own interests, and for the benefit of interests foreign to the interests and policy of the State, as expressed by the Statute Book of South Carolina.

These respondents are informed, and believe, that a large majority of the stockholders of the said Cheraw and Coalfields, or Cheraw and Salisbury Railroad Company, protest against the attempted sale of their stock by the said Benjamin D. Townsend, acting as President; that they have authorized legal proceedings to be instituted in their names as relators, disputing the validity of his election, and that of his said Board of Directors, and have done everything in their power to repudiate said action.

These respondents are further informed, and believe, that the action of the Board of Directors of said Company was procured by the said Benjamin D. Townsend for the purpose of effecting the sale of said stock to the relators, in the interests of said purchasers, and not in the true interest of the Cheraw and Salisbury Railroad Company.

That it was hurried on precipitately by the said Townsend, against the earnest remonstrances of a portion of said Board, as will appear by affidavits accompanying this return.

These respondents, further answering, say, that the sale to rival interests of the stock in question, giving the relators a controlling interest in the Cheraw and Darlington Railroad Company, would operate to the lasting injury of the said company, which is closely allied in interest to the Cheraw and Salisbury Railroad, and by its location, under State charter, is in natural antagonism to the Wilmington line, in which the relators are interested.

These respondents, further answering, deny the allegation of insolvency of the Cheraw and Darlington Railroad Company, so loosely and unfairly made by the said Benjamin D. Townsend, and, in support of their denial, refer to the fact of the sale of the stock of said company at ten dollars a share as proof of its solvency. In justice to said corporation and its stockholders, these respondents pray that this Court, at least, will not assume such insolvency, without the same being judicially established, after fair investigation by a jury of the country.

These respondents deny that there are any by-laws of the Cheraw and Darlington Railroad Company in existence, nor is there any statute of the State prescribing a specific duty to them in the trans-

fer of stock; and, reiterating, say, that they are not public officers, nor officers of a public corporation, and that no public duty devolves upon them in their custody of the books of the company and of the stock of the individual shareholders, who are mere private corporators; that, as officers of a private corporation, they exercise the authority and discretion of the company in the discharge of its duties as trustee for the owners of its stock, and in the performance of its contract obligations as a private individual with other private individuals, in reference to a mere matter of private property; that these respondents, and their company, are amenable to the law, by civil remedy, for abuse of such authority and discretion, for breach of trust, or for violation of contract obligations, but are not liable to be proceeded against by *mandamus* in the Supreme Court of the State for a mere refusal to transfer stock to a supposed purchaser; and they are advised and humbly submit to your Honors that the high prerogative, public writ of *mandamus*, is not the proper remedy for the alleged grievances complained of by the relators, nor issuable upon their demand, nor under the circumstances of this case as presented.

Wherefore, these respondents, having fully answered, pray that the said rule against them may be discharged with costs.

No evidence was given before the Court, and the case was heard upon the pleadings and affidavits accompanying the petition.

*Townsend & Hudson, Harllee, Memminger, Chamberlain,* for relators.

*Simonton & Barker, Corbin,* for respondents.

June 28, 1870. The opinion of the Court was delivered by

MOSES, C. J. The Court, in *The State, Ex Rel., The South Carolina Railroad Company* vs. *The Columbia and Augusta Railroad Company,* (January, 1869, 1 S. C., N. S., 46,) held that, by virtue of the power conferred by the 4th Section of the 4th Article of the Constitution, it had authority to issue writs of prohibition in cases properly cognizable by it.

So holding, for the reasons there given, the right cannot be doubted, as to the writ of *mandamus*, by express words granted in the same Section.

It is not necessary to duscuss so much of the return of the respondents as affirms " that they are not public officers, nor officers of a public corporation." Conceding this, still there are duties in-

cumbent on them, outside of those, which devolve upon them as trustees for the corporations.

Neither can they sustain their claim, that, in respect to the shares of the capital stock of their company, they owe no public duty whatever, and that, as to these, they are not subject to the writ of *mandamus.*

There is a marked difference between charters granted by the legislative power, which exact no public duties, and those under which the public acquires such rights that it can compel the corporation to respect them. A distinction has always been observed between companies chartered as trading associations, or scientific societies, or others of that character, "aiming only at objects of their own, and not contemplating any benefit to the public, or taking upon themselves any public government, duty or responsibility," which are exclusively private, and those where, although the inducement to their creation is individual gain, yet the interests of the community are so inseparably connected with them that what affects the one will be sensibly felt by the other.

Indeed, so much do railroad companies partake of the nature of public corporations, that Mr. Grant, in his work on corporations, at page 9, includes them in that class, "because they are established to secure great purposes of State, and holding out advantages and benefits, either to the public without restriction, or to every one who chooses to comply with their conditions."

Mr. Redfield, in his Law of Railways, (1 Vol. 53,) divides corporations "into *eleemosynary*, and those which are mere civil or political bodies, entrusted with certain rights, or duties, and required to perform certain functions more or less connected with the polity of the State or nation," and among the last he places railway companies.

According to the authorities of this country, the respondents may properly claim to be the official agents of a private corporation. This position, however, affords them no exemption from the liabilities which attach, by reason of the "great purposes of State," which, doubtless, to no small extent, induced the grant under which their company enjoys the large immunities conferred upon it.

Such has been the rapid increase of railroad companies, with the extended and exclusive privileges which they enjoy, that the material interests of the country are, to no small degree, influenced and controlled by them. The great facility which they afford for the transportation, not only of passengers, but of freights, has pre-

vented all rivalry by other means, and given them almost a mo-
nopoly of the whole carrying trade. If the State, through the
Courts, has no power over them by a short and speedy remedy, the
injury they may inflict, on not only private, but public interests,
might be so prejudicial and detrimental as to counterbalance all the
benefits derived from their establishment. From their number, and
the magnitude of their capital and operations, without the means
of an adequate check to their encroachment on private rights, they
might, indeed, become a power which the State itself might have
cause to fear.

The ground of the respondents, in this regard, cannot be main-
tained. Carried out to the extent proposed, any of the members
who desired to abandon their company, by selling out their shares,
might be beset with difficulties and embarrassments, and the man-
agement of their own private interests, against their will, subjected
to the guidance and control of their associates.

It is very true that whatever rules they may have adopted for
the transfer of their stock must be observed, but when a compli-
ance with them is offered, the officers are not at liberty to inquire
into the motives of the seller and the vendee, the purpose which
prompts the sale, or what will be the effect either on their own road or
some friendly one. Nor, if the formalities which they have pre-
scribed as the law which is to govern on such transfer are complied
with, can they withhold the proper action demanded of them, no
matter what may be the equitable interests of others, who, with notice
of the sale, have yet not taken any legal measures to prevent it.

The fact that this company, with a charter granted in 1849, and
an organization soon after following, has, up to this time, governed
its direction without any by-laws or specific rules and regulations, al-
though the power to make them is expressly granted, does not show
much foresight or care on the part of those so deeply interested in
the proper management of their own investments.

It is not necessary, in the absence of all by-laws, with respect to
the sale of stock in an incorporated company, to inquire if anything
more is necessary than a mere written assignment or transfer of the
certificate by the holder to the purchaser, to vest the latter with the
title. Such an inquiry here is not required, for it appears that this
company has, in effect, (not in the form of a by-law,) a regulation
as to the transfer of its stock, which, not only from long established
usage, but from its incorporation into the certificate, may well be
recognized as its own law in the matter.

"This certificate is transferable in person, or by attorney, at the office in Cheraw, South Carolina, on the surrender thereof."

The mode of the transfer has thus become a part of the contract with the holder.

The certificate of the shares in question was held by the Cheraw and Salisbury Railroad Company, of which the relator, Townsend, was the acting and ostensible President. The return seeks to justify the course of the respondents in refusing the transfer, on the ground of a notice by some of the stockholders of the said company, that the title and the right of Townsend and the Directors were disputed, and that legal proceedings would be instituted to test the questions. This might have been sufficient to suspend the act demanded by the relators, so that proper opportunity might be afforded for the course proposed, but cannot operate to justify a denial, still persisted in, when, after full time allowed for access to the Courts, it has not been made to appear that any process to enjoin has been granted or even asked for. Townsend was, for all purposes necessary to the safety and security of the respondents in dealing with them in transactions affecting the Cheraw and Salisbury Railroad Company, its President, claiming to have been so elected, and must be so recognized and regarded. Whether he was elected in due form, was not a question for the relators. He filled the office, and was so accepted and received, and until an act of ouster, by competent authority, he was the President, presumed to be rightfully in office.— *Bank of U. S.* vs. *Dandridge*, 12 Wheat., 79; *All Saints Church* vs. *Levett*, 1 Hill, 191; *Mohawk R. R. Co.*, matter of, 19 Wend., 135.

To entitle the relators to the writ, it is necessary to shew a demand and refusal. It is not essential, however, that "the word 'refuse,' or any equivalent to it, should be used, but there should be enough from the whole of the facts to shew the Court that, for some improper reason, compliance is withheld, and a distinct determination not to do what is required."—Tapping on Mandamus, 285; 3 Stephens, N. P., 2292; Angel and A. on Corp., 104.

Whatever obligation there may have been on the relators to appear at the office, and there demand the transfer, was removed by the notice of the respondents that it would not be made. It is not indispensable to a complete right to the remedy they ask, that so useless a ceremony should have been performed. It would have been a mere idle form, after the peremptory refusal by the President of the Cheraw and Darlington Railroad Company, for, without his

sanction, the transfer could not be made, and he had expressed his conclusion in plain and positive terms.

It is true, as alleged by the respondents, that to entitle a party to this writ, he must be clothed with a clear legal and equitable right to the thing which is withheld.—Tapping on Mandamus, 28 ; Moses on Mandamus, 115.

Is the claim of these relators founded on such right ?

The stock is held by the Cheraw and Salisbury Railroad Company. Its Directors, having its control, and vested with sufficient power to dispose of it, authorize their President, the relator Townsend, to make the sale, and so carry out the purpose of those who, to that end, represented the whole company. He contracts to sell it to his co-relators, Walters and Newcomer, at the price fixed by the Board of Directors; part of the purchase money was paid, and the balance stipulated to be paid " as soon as the proper and lawful transfer thereof could be made on the books of the Cheraw and Darlington Railroad Company, at their office in Cheraw." The fact that the transfer was prevented by the act of the respondents in no way affected the clear legal right of Townsend to make the sale, or that of Walters and Newcomer to be vested with the title to the stock on the payment of the money promised. The thing withheld was the stock, that was the subject of the contract ; unless the transfer was had, its end could not be consummated, and the design of the parties would be entirely disappointed. Were not the terms of the undertaking sufficient, if its performance had not been prevented by the respondents, to vest the title in Walters and Newcomer ?

The President of the Cheraw and Darlington Railroad Company had been informed of the sale by Townsend, and by Bridges, the agent of the other relators, previous to the letter of August 20, 1869, and the objection urged against the application for the transfer was not any impression on his own mind as to their legal right, but was the consequence of the notice of some of the stockholders of the Cheraw and Salisbury Railroad Company, above referred to. From regard to it, he refrained from the performance of the ministerial duty imposed on him through the contract of his company with that of the Cheraw and Salisbury Railroad as to the shares so held.

Why, in the absence of all legal proceedings, to which his company was a party, he undertook to favor, or protect the said stockholders of the Cheraw and Salisbury Railroad Company against the act of its President and Directors, directly representing them, is not

consistent with any obligation which he owed to the one company or the other. Whether the money was paid before the transfer, did not enter into the duty imposed on him by virtue of his office to transfer the stock. The seller and the buyer (by his agent) were both present, and it was for them to prescribe the terms of their contract—their terms became the law of it.

That Walters and Newcomer are joined in the writ, cannot prejudice the remedy to which Townsend may be entitled, had they not united with him. "Where two or more persons join, whose interests and cause of complaint are entirely distinct, it may well be doubted whether a joint application for the writ prayed for can be sustained."—Moses on Mandamus, 198. This proceeds on the general rule of pleading applicable in all actions, that several distinct rights, held by separate persons, cannot be included in the same writ. As in the instance put in the book, from which we have last above quoted, "where a record shews a certain sum awarded to Doe, and another to Blackwell, as damages severally sustained by them by reason of a road laid out across their lands, they have no such common interest as would authorize them to join in an application for a *mandamus* to compel payment."

The object of the writ is to compel the transfer of the stock, and in this the parties have a common interest. The right to it has grown out of a contract which they desire to complete, and occupying this position, they have a common purpose to be effected through the remedy which they claim. It might have been a cause for comment, if the persons who had contracted to buy the stock had not united in the application through which they were to become vested with its title.

The most important question remains to be yet considered.

Do the facts set forth in the suggestion, taken in connection with the statements of the return, entitle the relators to the writ which they ask?

It is urged "that it comprehends the execution of the common law and of statutes, Acts of Parliament, or of the King's charter, in all cases for which there exists no legal remedy; but not applicable, however, as a private remedy to enforce simple common law rights between individuals, as to compel payment of money due on a bond, or the restitution of chattels, still less to command a party to abstain from a tort or the abuse of his office."

Although it is difficult to lay down the precise line which separates the rights which an individual may demand from a railroad

company, growing out of the obligations which it owes to the public, from the fact of its being constituted for public purposes, and those which, as a separate and distinct individual, he may demand, proceeding from relations in which other members of the community are not directly concerned, yet such a distinction does exist, and is well founded.

The Courts do interfere by *mandamus* to compel the discharge of their duty by corporate officers. Angel & A. on Corp., 646, 651. Such interposition, however, could only be demanded where the act is enjoined by law, and must be of the character of the duties pertaining to the public. Any individual may become a member of the corporation by the purchase of its stock, and would be entitled to all the rights and privileges conferred by the charter, to the extent of the shares he might hold. It is a right given by the charter to the public, and to whichsoever office of the company appertains the duty to execute the new certificate which is to follow the transfer, as the evidence of the title, such officer is in violation of the statutory duty required if he refuses.

The duty, although a public one, will not be enforced by *mandamus*, if the party claiming the right to its performance can (in the language of the argument) have recourse to any " other specific remedy adequate to enforce that right."

While the general principle, thus affirmed, may be conceded, yet the rule, as now understood and acted on by the Courts, does not deny the writ, where, formerly, it would not have been allowed, because a remedy, affording compensation in damages for the wrong committed, might be found in a resort to an action on the case. " The remedy for satisfaction must not only be adequate, but it must be for complete satisfaction, equivalent to a specific relief."— Tapping on Mandamus, 20.

" If the remedy be not equally convenient and efficacious, the Court will grant the writ."—*Ibid*, 19. "And it must be specific and adequate to enforce the right."—Angel and A. on Corp., 653.

" *Mandamus* lies to compel an officer to execute the duties of his office, though he be liable to penalties, or an action on the case for the neglect of them."—*Ibid*, 655.

Notwithstanding these principles, which would seem to require the other remedy to be " specific, and adequate" to the purposes sought by the writ, many authorities, both in England and this country, may be adduced to shew that, although the compensation

in damages will not accomplish the end proposed by, and consequent on the writ of *mandamus*, yet, if recourse can be had to an action, through which it may be had, the writ will be refused.

Can it, therefore, issue where the purpose is to require the transfer of shares in a railroad company ?

Various cases have been cited, where, for the same object, it has been refused against banking corporations, on the ground that a recovery of damages may compensate for the loss; but yet, in *Rex* vs. *Worchester Canal Company*, 1 M. and R., 529, it was held that the writ could issue to compel the entry on the books of the defendant of the probate of the will of a deceased shareholder under which the executrix was the proprietress of his shares, leaving any question as to its validity and effect to be raised by the return.

So, too, in *Regina* vs. *The Liverpool, &c., Railway Company*, 11 Eng. C. L. R., 408, where a *mandamus* was applied for against the company to command them to enter a memorial of transfer of shares, though it was refused, on the ground that the relator was not proceeding *bona fide*, in answer to the argument that the writ would not lie to permit a transfer of stock to be made on the books of the company, *Lord Campbell*, C. J., said, "In an action, only damages could be recovered, and the full object of the party would not be answered."

In *Harris* vs. *The Irish Land Company*, 3 Ellis and B., 512, the same C. J. said: "But where there is a duty, in the fulfillment of which the plaintiff is personally interested, and which ought to be fulfilled under royal charter, the non-performance being a grievance to an individual, that is clearly a case within the intention of the Legislature, and it is precisely this case. The plaintiff is entitled to the shares, the company refuse to register his name; before the act, in such a case, a prerogative writ would have been granted." *Coleridge* and *Wightman*, J. J., both concurred.

Mr. Moses, in his work on *mandamus*, page 108, says: "It seems unquestionable that a right of action for damages generally exists against public officers who refuse or neglect to perform their duty in favor of those persons whose rights are injuriously affected by such neglect of duty. But this remedy, by action against the officers, is of such doubtful and uncertain character as not to supersede that of *mandamus*. The unliquidated damages to be assessed by a jury would not necessarily be the amount due the party."

At page 161, he says: "That a writ of *mandamus* will lie in

such case, seems to be sustained by the weight of modern authority."
Mr. Redfield, in his work, before referred to, at page 144 of 1st
Vol., says: "There can be no question, probably, in this country,
that where the company refuse, on reasonable request, to make the
proper entry on their books; of the transfer of shares, whereby the
owner is liable to be deprived of any legal right or pecuniary ad-
vantage, the company may be compelled to do their duty, in the
premises, by writ of *mandamus.*"

And. at page 281, of his 2d Vol., he says: "And this is the
proper remedy to compel a corporation to allow the transfer of stock
upon their books, or the company may be compelled to pay damages
for such refusal by an action at law."

In the case of the *State* vs. *Lehre,* 7 Rich., 234, which has been
referred to in the argument, it was not decided that *mandamus* would
not lie, because the relators might be indemnified through an action
if they were wronged; but the writ was refused because "of the
legal inability of the Commissioners and the practical difficulty, if
not impossibility, of their compliance with the required demand."

In the *State* vs. *N. E. R. R. Co.,* 9 Rich., 253, Judge Glover, in
delivering the opinion of the Court, says, "the general rule has been
restricted to cases where the specific remedy is equally convenient,
complete and beneficial."

What did these relators propose to accomplish by the writ?
Townsend, on his part, desired to make available the shares of his
company in the Cheraw and Darlington Railroad Company, through
his contract with his co-relators, while they sought to obtain them,
that, through their possession, they might have an interest and in-
fluence in the company. What damages recoverable for the alleged
breach of duty would vest them with the stock? That, with the
proceeds of a verdict, they might supply its place by another pur-
chase, is no answer, for it might follow that, on an application for
the transfer and certificates of the new bought shares, they might
encounter the same difficulty, and the result would be that the
Cheraw and Darlington Railroad Company could compel the Cheraw
and Salisbury Railroad Company to hold their stock against their
will, and forever exclude Walters and Newcomer from becoming
members of their corporation. Suppose, however, the Cheraw and
Salisbury Railroad Company brought their action and recovered;
then, being owners of four thousand shares, they would be called on
to contribute to the payment of a judgment debt due in part to
themselves. Suppose it brought by the other relators, and a verdict

4A

had, then they would hold a money demand against a company with which they were seeking association, and which demand, by increasing the liabilities against it, might affect the very stock which they sought to purchase.

The return of the respondents illustrates the fact that, besides the market worth of railroad stocks, they may have a value which might recommend them by reason of the power and patronage which they might command. Their chief objection to the transfer of the shares appears to be the purpose to which they are to be devoted in the hands of the purchasers, "to control the said Cheraw and Darlington Railroad, and Cheraw and Salisbury Railroad, for the purposes of their own rival line by way of Wilmington, for their own interests, and for the benefit of interests foreign to the interests and policy of the State, as expressed by the Statute Book of South Carolina."

With what was so often alluded to in the argument, "as the politics of the case," the Court has no concern. It decides on the rights of parties involved in the issue before it, without regard to the extrinsic circumstances which may be the consequence of its adjudication.

The jurisdiction under this writ has been so "amplified," since it was first known as a "mere letter missive from the sovereign power, commanding the performance of some particular act or duty, to which no return was allowed, and disobedience of its command was punishable by attachment," that it can only be accounted for by the fact, that its prompt and speedy action, and the specific relief which it affords, recommended it to adoption as one of the favorite remedies of the law. While its limits have been extended in England, there has never been an attempt by the Legislature of any State in the Union to contract them.

If, in those rude days, when commerce scarcely existed, and the improvements of the time in which we live, if they could have been then even imagined, would have been received as the vagaries of a lunatic, or the pictures of a dream, the writ was regarded with favor, and preference over those forms of action which were attended with so much uncertainty and delay, is it surprising that the beneficent ends it was designed to attain should be so increased as to keep pace with the enlarged trade and business of the country? No insignificant portion of these are carried on by corporations, which have so multiplied in number and enlarged in capital that they have become a power so strong in the country as to render necessary a remedy through which their breaches of duty to the public may be

the more speedily met than through the slow progress of an action at law. This necessity has not been confined to the remedies at law. The jurisdiction of equity, by the force of the same circumstances, has been enlarged to meet the exigencies demanded by the material changes which the intelligence of the day is effecting.

It was for a long time held that Courts of Equity would not decree specific performance of a contract for the sale of personal chattels. The necessity, however, for the prompt process of that Court, in cases where damages were uncertain, and might not be adequate compensation for the thing withheld, so by degrees extended the jurisdiction, until at last it was held, in *Adderly*, vs. *Dixon*, 1 S. and S., 607, "that it would be decreed at the suit of the vendor, of a contract for the sale of debts proved under a commission of bankruptcy."

The extent and use of railroads have outstripped the anticipations of even the most hopeful and visionary of their friends. Charter after charter is granted, and the whole country is almost connected by the roads upon which their trains are run.

They were granted as well for public purposes as individual profit. Combined, they form a power that, unrestricted by law, could control the State.

They owe duties as well to the community at large as to their stockholders; and by reason of its prompt, speedy and decisive action, and the adequate service it is calculated to render where breaches of duty are committed by those companies, there seems to be no well sustained reason why the writ of *mandamus* should not be called into requisition.

The order granting the application has been filed.

*Willard*, A. J., and *Wright*, A. J., concurred.